MADDOX, Justice.
This lawsuit arises out of a failed waterfront development in Talladega County originally known as Point Aquarius and now operated as Alpine Bay Resort. The dispositive issue on appeal is: Did the trial court err in instructing the jury on the elements of an express trust in Alabama? More precisely stated, the issue presented is whether the trial court erred in instructing the jury that, in order to find that a valid express trust had been created under Alabama law, it had to find that the settlor of the alleged trust had given up all control over the res of the trust.
Because we conclude that Alabama law requires the settlor of an express trust to give up control over the trust res in order to create a valid express trust, except in a declaratory trust situation, the jury instructions at issue here were proper. Therefore, we affirm. Because we affirm the judgment, we find it unnecessary to address the issues raised on cross-appeal.
The dispute in this case concerns a series of agreements between the Coosa River Water, Sewer and Fire Protection Authority (“the Authority”), SouthTrust Bank of Alabama, N.A. (“SouthTrust”),[1] and International Resorts, Inc. The parties have stipulated to the basic facts.
International Resorts planned to develop a resort community in Talladega County known as Point Aquarius. The Talladega County Commission formed the Authority to build, or to have built, and to operate, a water and sewer system for the Point Aquarius project. International Resorts partially built the water and sewer system. The Authority then contracted to buy the system, with the understanding that International Resorts would complete the system for the Authority.
To purchase the water and sewer system from International Resorts, the Authority planned to issue and sell $5,500,000 in tax-exempt bonds in two installments. San Francisco Securities, Inc., a California securities and bond underwriting company, purchased $3,800,000 of these tax-exempt *1060 bonds. However, it refused to buy the remaining $1,700,000 of the bonds. The Authority’s inability to sell the $1,700,000 installment of the bonds is the heart of the dispute.
After the Authority agreed to buy the water and sewer system from International Resorts, it contracted for International Resorts to be its “service manager.” As service manager, International Resorts agreed to collect water and sewer fees from the Point Aquarius homeowners and to pay those fees to the “fiscal agent.” The Authority contracted with SouthTrust for SouthTrust to be its “fiscal agent.”[2] As fiscal agent, SouthTrust agreed to keep the accounts for the project, to collect the water and sewer fees from the service manager, and to pay the bondholders upon demand with these collected fees. Ultimately, however, International Resorts was responsible for paying off the bondholders with the collected fees.[3]
When the Authority could not sell the second installment of its bond issue, this put International Resorts, and the entire Point Aquarius project, in financial trouble. At a certain point, International Resorts refused to turn over the collected water and sewer fees because the Authority had not fully paid for the water and sewer system. In the meanwhile, all three members of the Authority’s board of directors resigned, and the county commission was unable to find anyone willing to serve.
In 1977, SouthTrust filed the initial complaint in this case, asking for injunctive relief against the Authority and the Tal-ladega County Commission. SouthTrust asked that the county commission be required to appoint members to the Authority’s board of directors, based on South-Trust’s claim that without a board of directors with which to deal it was in the awkward position of being a fiscal agent without a principal. The problem facing SouthTrust was whether it should sue International Resorts for the collected water and sewer fees or allow it to be in default. International Resorts argued that it was not breaching its service manager agreement with the Authority because the Authority had failed to fully pay it for the water and sewer system. International Resorts argued to SouthTrust that it was not in default on the service manager agreement because it had been charged with debt service on $5,500,000 when, in fact, it had received only $3,800,000.
The court refused SouthTrust its requested relief. SouthTrust then amended its complaint to ask for appointment of a receiver to handle the duties of the board of directors. The court appointed Robert Meeks as receiver.
In 1978, SouthTrust calculated that the amount of water and sewer fees collected by International Resorts but unpaid exceeded the amount of any overpayment International Resorts had made on the debt service. At that time, SouthTrust began collecting the water and sewer fees directly from the Point Aquarius property owners.
In 1983, the Authority, acting through Meeks, its receiver, sued SouthTrust, alleging breach of the fiscal agent agreement and fraud. In its complaint, the Authority contended that SouthTrust should have taken steps to collect the water and sewer fees from the Point Aquarius property owners earlier and that SouthTrust should have applied these fees to retirement of the bonds immediately. Further, the Authority contended that SouthTrust defrauded it by not disclosing to it all the above facts.
*1061 SouthTrust moved to dismiss and for a summary judgment, based on the applicable statutes of limitations for fraud and contract actions and based on the express terms of the fiscal agency agreement. The trial court denied its motions and set the case for trial. After the Authority presented its evidence, SouthTrust made a motion for a directed verdict; the trial court deferred its ruling on that motion and instructed SouthTrust to present its case. At the end of SouthTrust’s case, the court held a second hearing on SouthTrust’s motion for directed verdict. At that time, the Authority abandoned its fraud and breach of contract claims, choosing to proceed only on an express trust theory. The Authority then asked for permission to amend its pleading to state a claim alleging the breach of an express trust. The trial court allowed the Authority to add that theory. Also, the trial court allowed SouthTrust to amend its answer to assert various defenses.
The trial court submitted the case to a jury, and the jury returned a verdict in favor of SouthTrust and against the Authority. The trial court entered a judgment consistent with the jury verdict. The Authority moved for a new trial based on the court’s jury charge on the requirements of an express trust. The trial court denied the Authority’s motion.
The Authority appealed, and SouthTrust cross-appealed. We affirm the judgment and pretermit any discussion of the issues raised on cross-appeal.
The Authority argues that the trial court erred in giving two jury instructions relating to the law of express trusts. The Authority first asserts that jury instruction 94 is an incorrect statement of the law. That instruction states:
“94. I charge you, members of the jury, that in order to prove the existence of an express trust, the plaintiff must establish that the trustee accepted and had total and sole control over the property of the trust, and that the beneficiary of that trust had parted with all control or authority over the property of the trust.”
(C.R. at 575; R. at 572; emphasis supplied.[4])
Further, the Authority complains that an addition to its requested jury charge No. 4 was erroneous. The charge states:
“Now, the elements of a trust include these five items:
“(1) The existence of a trustee,
“(2) The existence of a beneficiary,
“(3) Some type of trust property, not a relationship involving merely personal duties,
“(4) The passing of title of the property to the trustee to hold title for the benefit of another; and grantor has parted with total control over the property of [the] trust.
“(5) A manifestation of intention to create an express trust relationship.”
(R. at 558; emphasis supplied.)
The Authority asserts that the charge is correct, save for the emphasized portion stating that “grantor has parted with total control over the property of [the] trust.”
In response, SouthTrust argues that a settlor may indeed retain some control over the administration of the trust, but that the settlor may not retain control over the res itself.
The law in Alabama is clear that a settlor may retain the right to revoke, modify, or alter a trust. In Merchants National Bank of Mobile v. Cowley, 265 Ala. 125, 132, 89 So.2d 616, 622 (1956), this Court stated:
“There seems to be no question that the settlor of a trust, ‘if he desires to do so, and expresses his intention in the trust instrument or in another appropriate way, ... may retain in himself a power to change the terms of the trust in general or in one or more particular ways specified, as with regard to the *1062 names and shares of the cestuis, the personnel of the trusteeship, or the property to be subject to the trust.... So likewise the settlor may by express provision vest in himself a power to revoke or cancel the trust at will, or on the happening of a certain contingency.’ ”
(Citation omitted.)
Further, Stacey v. Saunders, 437 So.2d 1230, 1234 (Ala. 1983), states, “There is no question that a settlor/grantor may retain a power to revoke a trust.” (Citing, Merchants National Bank of Mobile v. Cowley, 265 Ala. at 132, 89 So.2d at 622).
However, we conclude that South-Trust’s distinction between retaining control over administration of the trust, which is permissible, and retaining control over the res itself, which is impermissible, is valid, except in declaratory trust situations.[5] Treatises on the law of trusts and an Alabama statute support this distinction.
1 William F. Fratcher, Scott on Trusts § 37 (1987), states:
“A conveyance, whether absolute or in trust, is ineffective if the transferor does not surrender control over the property. We have already referred to the situation where an intended gift, either absolute or in trust, fails because the donor has not surrendered dominion over the property. A conveyance in trust is incomplete unless the settlor has passed the title to the property to the trustee by delivery of the subject matter of the trust or of an instrument of transfer. On the other hand, if the conveyance in trust is completed by such delivery, the trust is not incomplete merely because the set-tlor reserves power to revoke or to alter the trust. There is sufficient surrender of control over the property if the settlor transfers the title to it to the trustee, even though he reserves power to undo what he has done. The surrender of control is sufficient even though the set-tlor reserves power to reassume the control.”
Also, Scott on Trusts, supra, § 57.2, states, “The settlor may reserve not merely a life interest and a power to revoke the trust in whole or in part or to modify it but also a power to control the trustee in the administration of the trust.” (Emphasis supplied.)
Further, 76 Am.Jur.2d Trusts § 29 (1992) states:
“[A] revocable living trust is valid even though the settlor reserves an extensive power of control over administration of the corpus. However, where the powers retained by the settlor amount, in cumulative effect, to ownership of the trust estate, with such control over the administrative functions of the trustee as to make of him simply the settlor’s representative, no valid trust is established. Similarly, while a trust instrument may purport to name a beneficiary, if the settlor reserves a substantial interest or unbridled control over management of the operations that is not for the benefit of the purported beneficiary, the trust may be found to be illusory. In such circumstances, it has been stated that the settlor remains the owner of the property and there is no beneficiary.”
(Emphasis supplied; citations omitted.)
Importantly, § 35-4-251, Ala.Code 1975, states, in pertinent part, “But for a trust to be valid as a trust the legal title throughout the trust must vest in one or more trustees, with the power and duty to manage the trust property, subject to the supervision of the courts_” See also, Bailey v. Brannon, 293 Ala. 83, 300 So.2d 344 (1974).
Consistent with the above statements, we hold that a settlor may retain powers over the administration of the trust, but *1063 that, except in a declaratory trust, he must give up control of the res or trust property itself. Because both jury charges at issue here involved the settlor’s giving up control “over the property of the trust,” that is, giving up control over the res of the trust and not over administration of the trust, they correctly stated Alabama law. Therefore, we affirm the judgment of the trial court.
AFFIRMED.
HORNSBY, C.J., and SHORES, ADAMS, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.

. SouthTrust is the successor in interest to Birmingham Trust National Bank. Although Birmingham Trust actually participated in most of the pertinent events in this case, we refer to Birmingham Trust as SouthTrust throughout for the sake of convenience and to avoid confusion. SouthTrust presents three issues on its cross-appeal: (1) whether the trial court erred in denying SouthTrust’s motions to dismiss, for a summary judgment, and for a directed verdict at the close of Coosa River’s case-in-chief; (2) whether the trial court erred in allowing Coosa River to amend its complaint to add the express trust theory after Coosa River had initially closed its case-in-chief; and (3) whether the trial court erred in admitting Coosa River’s evidence of damages.

. SouthTrust took the position, at the trial level and here, that it had the title "trustee" in the bond documents changed to “fiscal agent.” The jury was presented evidence that SouthTrust amended the contract with the Authority to designate SouthTrust as "fiscal agent” rather than "trustee,” and SouthTrust, in its brief, says that "the contracts and other documents in this case refer to SouthTrust as the ‘fiscal agent' on approximately 176 occasions.”

. International Resorts was a wholly owned subsidiary of Investors Corporation of America. Investors Corporation’s largest shareholder was Life Insurance Corporation of America. Life Insurance Corporation was a wholly owned subsidiary of Pacific American Corporation. All three of International Resorts’ "parents" guaranteed the debt. All three, however, were either in bankruptcy or were in receivership when Mr. Robert Meeks became Coosa River’s receiver.

. Instruction 94 states only inferentially that the settlor must give up control of the trust res, because it states that, to find an express trust, the jury must find "that the trustee accepted and had total and sole control over the property of the trust.” Nothing is said directly about the settlor’s giving up all control over the res. Inferentially, however, one must conclude that the settlor must give up control of the res if the trustee is to have total and sole control over it.

. A "declaratory trust,” of course, occurs when a settlor declares himself trustee of property for the benefit of another, the beneficiary. See, George T. Bogert, Trusts § 30 at p. 96 (6th ed. 1987). In such a case, legal title is not really transferred to the trustee, but the settlor is merely separating legal title from equitable title. See, George G. Bogert and George T. Bogert, The Law of Trusts and Trustees § 141 (Revised 2d ed. 1979).
We note that Coosa River’s reliance on Jones v. Ellis, 551 So.2d 396 (Ala.1989), is misplaced, because Jones is a declaratory trust case.